# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **TEAMSTERS LOCAL 469 PENSION FUND AND THE BOARD OF TRUSTEES THEREOF,**<br><br>**Plaintiff(s),**<br><br>**v.**<br><br>**J.H REID GENERAL CONTRACTORS, J.H REID CONSTRUCTION, INC., J.H. REID-ONSITE RECYCLING, INC.,**<br><br>**Defendant(s).** | Civ. No. 15-06185 (KM) (JBC)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiffs Teamsters Local 469 Pension Fund and the Board of Trustees Thereof ("Pension Fund" or "the Fund") initiated an action for collection of withdrawal liability, interests, and penalties allegedly incurred by defendants J.H. Reid General Contractors ("General Contractors"), J.H. Reid Construction, Inc. ("Reid Construction"), and J.H. Reid-Onsite Recycling, Inc. ("Reid Recycling") as a result of their withdrawal from the Pension Fund. [1] (Compl. at 1-2) The Fund's action arises under the Employment Retirement Income Security Act of 1974 ("ERISA") as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 10001 et seq. (1982). (Compl. at 2)

---

[1]     Citations to the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

"DE" = Docket entry number in this case.

"Compl." = Complaint

The Pension Fund moves for summary judgment on the grounds that the employer, General Contractors, failed to make the required payments, and that Reid Recycling and Reid Construction, as members of a controlled group with the employer at the time the Fund served the employer with notice of its withdrawal liability, are jointly liable. (DE 102-2) Defendants do not dispute the liability of General Contractors. They submit, however, that summary judgment should be denied as Reid Recycling and Reid Construction because they were not parties to a collective bargaining agreement and were not members of a controlled group at the time General Contractors withdrew from the pension plan. (DE 105 at 2)

For the reasons explained in this opinion, I find that there are material issues of fact as to controlled group liability and will deny the Fund's motion as to Reid Recycling and Reid Construction.

## I.    Summary

### a.  Facts

Pension Fund is a multi-employer pension plan within the meaning of 29 U.S.C. §§ 1002(37) and 1301(a)(3), and an employee benefit plan within the meaning of 29 U.S.C. § 1002(3). (Compl. ¶4); (DE 43-1 ¶2) In a certification to this Court, Frederick P. Potter, Jr., the President of Teamsters Local Union 469 ("the Union") and Chairman of the Board of Trustees for the Pension Fund, submitted that defendants "and the Union were parties to a series of collective bargaining agreements over a period in excess of 10 years." (DE 43-1 ¶¶1-2) Pursuant to those agreements, General Contractors "was required to remit, on a monthly basis, pension contributions to the Fund on behalf of the bargaining unit employees that it employed." (DE 43-1 ¶7) In August 2009, General Contractors permanently ceased the operations that were covered by the collective bargaining agreements. (DE 43-1 ¶3) That cessation "and failure to employ people represented by the Union resulted it in no longer having an obligation to contribute to the Fund on behalf of employees" covered by the collective bargaining agreements. (DE 43-1 ¶8) Thereafter, the Pension Fund

12

"determined that Reid had [e]ffected complete withdrawal from the Fund." (DE 43-1 ¶9)

In August 2012, "the Fund, by and through its attorneys gave notice to the Reid companies of the Fund's claim for withdrawal liability owed by the Reid companies to the Fund." (DE 43-1 ¶3); (DE 43-1 at 6-8) That letter stated that the net amount of withdrawal liability amounted to $1,239,857.00, to be paid in eighty quarterly payments of $15,479.00. (DE 43-1 ¶11)

After that notice, on December 28, 2012, General Contractors made the first quarterly payment of withdrawal liability in the sum of $15,479.00. (DE 43-1 ¶4) General Contractors simultaneously "invoked arbitration . . . to contest the Fund's calculation of withdrawal liability as well as to contest whether or not a withdrawal had taken place as well as whether Reid was entitled to a construction industry exemption." (DE 43-1 ¶4) No defendant made any further quarterly payment, which, according to the Fund, "eliminate[d] any right to arbitration that Reid may have had under ERISA." (DE 43-1 ¶5) Further, on February 14, 2014, General Contractors withdrew from arbitration. (DE 43-1 ¶13); (DE 43-1 at 14) Pursuant to the Pension Fund's Trust Agreement, failure to pay withdrawal liability payments entitles the Fund to collect: "[a]. Unpaid contributions; [b]. Interest at eighteen percent (18%) per annum; [c]. Liquidated damages of twenty percent (20%) of the principal debt; and [D]. Attorney's fees of 25% of the delinquent principal amount and court costs." (DE 43-1 ¶15)

Mr. Potter also certifies that defendants "constitute a 'controlled group' under ERISA Section 4001(b)(1), 20 U.S.C. 1301(b)(1) and Section 4219(a) of ERISA, 20 U.S.C. 1399(a) and Sections 414 and 1563 of the Internal Revenue Code." (DE 43-1 ¶3) The implication is that the withdrawal liability of General Contractors extends to Reid Recycling and Reid Construction.

Upon certification to this Court, Daniel Culnen submits that he is presently "the sole Member and Manager of J.H. Reid Holdings II, LLC ("Reid Holdings"), which is the sole owner of [Reid Recycling]." (DE 85-1 ¶1) Reid Holdings purchased Reid Recycling on November 30, 2012 (DE 85-1 ¶3) and

owns one hundred percent of Reid Recycling's stock shares. (DE 85-1 ¶4). Since the purchase in 2012, Reid Recycling has been owned solely by Reid Holdings. (DE 85-1 ¶5)

According to Mr. Culnen's certification "Reid Holdings was not provided notice that Reid Recycling may be subject to withdrawal liability for allegedly withdrawing from Plaintiff's pension fund." (DE 85-1 ¶6) Further, since being purchased by Reid Holdings, Reid Recycling has remained a separate and distinct entity from General Contractors and Reid Construction. (DE 85-1 ¶8) Reid Recycling is also not a party to the relevant collective bargaining agreements. (DE 85-1 ¶10) Mr. Culnen submits that "Reid Recycling is not part of a control group with Reid Contractors and Reid Construction because it has separate ownership." (DE 85-1 ¶13)

During his deposition, James H. Reid testified that he owned one hundred percent of the interest in General Contractors when it was originally formed. (DE 102-1 at 19) Over the years, two other individuals, Ken Lindstrom and John Leslie, acquired an interest of less than ten percent collectively. (DE 102-1 at 19) In short, Mr. Reid continuously had control over the company. (DE 102-1 at 19)

Mr. Reid further testified that when Reid Recycling was created, he owned the entirety of its shares. (DE 102-1 at 20) He then sold that company to Mr. Culnen in November 2012. (DE 102-1 at 20) Mr. Reid testified that at the time of sale, he owned one hundred percent of Reid Recycling's shares and sold one hundred percent of those shares to Mr. Culnen.[2] (DE 102-1 at 20) Mr. Reid conceded that, at the time of his deposition, he was taking medication that impairs his ability to recall events or facts in the past. (DE 102-1 at 18)

Mr. Culnen testified during his deposition that he and Mr. Reid began discussing Mr. Culnen's acquisition of Reid Recycling in August or September 2012. (DE 102- at 6) Mr. Reid approached Mr. Culnen because Reid was having

---

[2] As will be discussed later in this opinion, defendants submitted Mr. Reid's 2011 tax return indicating that Mr. Reid owned only 62.3% of Reid Recycling's shares for that year. (DE 105-3 at 1)

financial problems. (DE 102-1 at 6) Mr. Culnen and Mr. Reid's business relationship preceded the acquisition: Culnen wrote Reid's insurance policies and bonds, and leased equipment to him. (DE 102-2 at 6)

Regarding his due diligence prior to the sale, Mr. Culnen testified that he "had the attorneys do a search on all of the records . . . to see if there were any liens filed, and see if the taxes were current." (DE 102-1 at 7) He stated that he "had the attorneys do everything that they were supposed to do to clarify the title." (DE 102-1 at 7) Mr. Culnen and Mr. Reid then entered into a written contract for the sale of Reid Recycling for 2.6 million dollars. (DE 102-1 at 7) Mr. Culnen testified that he never learned, either through his own attorneys or Mr. Reid's attorneys, of the liabilities of Mr. Reid or his companies to the Fund. (DE 102-1 at 8) According to Mr. Culnen, he first learned that General Contractors "owed some union money" in 2016. (DE 102-1 at 8)

### b. Procedural History

On August 13, 2015, Pension Fund filed its Complaint against defendants seeking $1,224,378 in withdrawal liability. (Compl. ¶18) Further, the Fund alleged that defendants' failure to pursue arbitration entitled it to the following relief: (1) $1,224,378 in withdrawal liability principal; (2) pre-judgment interest on the entire amount; (3) an amount equal to or greater of the interest on the withdrawal liability of liquidated damages of 20% of the unpaid withdrawal liability; (4) attorney's fees of 25% of the principal and costs; (5) post-judgment interest at an annualized rate of 18%; (6) that the Court retain jurisdiction; and (7) further relief as may be proper and just. (Compl. ¶16, 18)

On October 5, 2015, the Clerk's Office filed an entry of default as to defendants. Thereafter, the Court entered an order denying the Fund's motion for default and granting defendant's cross-motion to vacate default. (DE 20) Defendants then filed their Answer to the Complaint on April 8, 2016. (DE 21)

On June 26, 2017, Pension Fund moved for summary judgment. (DE 43) On June 13, 2019, the Court denied that motion without prejudice and further ordered the parties to engage in additional discovery as to whether defendants

12

are or formerly were joint members of a controlled group. (DE 92) The Court authorized Pension Fund to file a supplemental motion for summary judgment within sixty days. (DE 92) The Fund resubmitted its summary judgment motion on November 12, 2019. (DE 102)

On April 7, 2020, the Court entered a text order acknowledging counsels' request that judgment be withheld while the parties explored other options and administratively terminating the motion without prejudice. (DE 109) On May 11, 2020, the Fund requested to restore its motion for summary judgment to the calendar. (DE 110) That motion is now before the Court.

## II.   Discussion

### a.   Legal standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex*, 477 U.S. at 322-23. "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The opposing party

must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### b. ERISA as amended by the MPPAA

Under ERISA, as amended by the MPPAA, "employers may make contributions to one or more pension plans on behalf of their employees who

12

belong to a participating union." *Flying Tiger Line v. Teamsters Pension Trust Fund*, 830 F.2d 1241, 1243 (3d Cir. 1987). The MPPAA was designed to remedy ERISA's failure to "protect plans from the adverse consequences that resulted when individual employers terminate[d] their participation in, or withdr[e]w from, multiemployer plans." *Id.* (internal citations omitted) (alterations in original) (citing *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722 (1984)). To safeguard such plans, the MPPAA created an infrastructure to assess withdrawal liability for employers that terminate or withdraw from those pension plans. *Id.* at 1243-44.

Pursuant to the MMPPA, "when a contributing employer withdraws from participation in a fund, the employer is responsible for his pro rata share of the unfunded vested liability remaining in the fund at the time of withdrawal, subject to certain adjustments." *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc. v. Centra*, 983 F.2d 495, 498 (3d Cir. 1992) (citing 29 U.S.C. § 1381(b)). Any businesses "under common control" of a contributing employer are also liable when an employer withdraws from a fund. *Id.* (citing 29 U.S.C. § 1301(b)(1)). "Whether a corporation has acquired control of a contributing employer by the date the contributing company withdraws from a multiemployer pension fund is a legal question for a district court to decide." *Id.* at 501 (citing *Flying Tiger Line*, 830 F.2d at 1249-51); *Galgay v. Beaver Brook Coal Co.*, 105 F.3d 137, 141 (3d Cir. 1997) ("[W]e have distinguished between disputes over whether an entity has ceased to be an employer within the meaning of MPPAA, which must be resolved in arbitration, and disputes over whether any entity has ever become an employer, which must be resolved in the courts."). While an arbitrator decides if an employer is attempting to evade liability, "an entity which has never been an employer within the meaning of MPPAA is not subject to the arbitrator's jurisdiction." *Galgay*, 105 F.3d at 142. Thus, questions involving an entity's employer status – such as whether an entity is a member of a controlled group and therefore deemed an employer – "is properly resolved in the courts." *Id.*

12

### (1) The MPPAA's Statutory Scheme

The scheme imposed by the MPPAA is as follows. When an employer withdraws from a pension plan, the trustees must determine the amount of withdrawal liability owed. *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund v. Gotham Fuel Corp.*, 860 F. Supp. 1044, 1047 (D.N.J. 1993); 29 U.S.C. §§ 1381, 1382(1). Then the trustees must notify the employers of the amount of and schedule for withdrawal liability, and demand payment in accordance with that schedule. *Gotham Fuel Corp.*, 860 F. Supp. at 1047; 29 U.S.C. §§ 1382(2), 1399(b)(1). The MPPAA then provides the employer with ninety days from the receipt of notice to request a review of the liability assessed by the trustees, identify any inaccuracies, and furnish any additional relevant information. *Gotham Fuel Corp.*, 860 F. Supp. at 1047; 29 U.S.C. § 1399(b)(2)(A). Either party may initiate arbitration proceedings if they cannot agree on the amount of withdrawal liability owed. *Gotham Fuel Corp.*, 860 F. Supp. at 1047; 29 U.S.C. § 1401(a)(1). However, if the employer fails to pursue arbitration, then "the withdrawal liability assessment becomes due and owing and the trustees may commence an action to collect the unpaid withdrawal liability from the employer." *Gotham Fuel Corp.*, 860 F. Supp. at 1047; 29 U.S.C. §§ 1401(b)(1), 1451. The trustee may commence an action in a court of competent jurisdiction for the collection. 29 U.S.C. § 1401(b)(1); *Galgay*, 105 F.3d at 139 ("When an employer fails to make a withdrawal liability payment within the prescribed time, an action may be brought in federal or state court to compel payment.").

The MPPAA's "pay first, dispute later" policy requires the employer to make interim payments to the pension fund pending any final resolution – either through arbitration or by a federal court. *Centra*, 983 F.2d at 498, 508 (holding, *inter alia*, that "ERISA's specific strong policy mandating immediate payment cannot be overridden by general notions that settlements should be accorded finality" and that until the District Court ruled on the enforceability of the settlement agreement, the employer was required to make interim

payments to the pension fund); 29 U.S.C. § 1399(c)(2) ("Withdrawal liability shall be payable in accordance with the schedule set for by the plan sponsor under subsection (b)(1) beginning no later than 60 days after the date of the demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.").

### (2) Common Control

"Only employers may be liable for withdrawal payments." *Centra*, 983 F.2d at. at 502. Under ERISA, an employer "include[s] businesses under 'common control' with the actual employer on the withdrawal date." *Id.* (citing 29 U.S.C. § 1301(b)(1)). 29 U.S.C. § 1301(b)(1) provides:

> For purposes of this subchapter, under regulations prescribed by the corporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer. The regulations prescribed under the preceding sentence shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of Title 26.

Defendants do not dispute that they are a trade or business. (*See* DE 105) Therefore, the only aspect of the employer test at issue in this matter is whether defendants Reid Recycling and Reid Construction belong to the same controlled group as General Contractors. More precisely, the question is whether Reid Recycling, Reid Construction, and General Contractors were subject to common control at the time General Contractors withdrew from the Pension Fund.

ERISA incorporates the Internal Revenue Code's "standards for determining whether two related corporations are within a controlled group"—that is, whether they are under common control and "therefore deemed to be a single employer." *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788

F.2d 118, 123 (3d Cir. 1986); *New Jersey Bldg. Laborers' Statewide Pension Fund and Trs. Thereof v. Richard A. Pulaski Construction*, 322 F. Supp. 3d 546, 557 (D.N.J. 2018). Pursuant to 26 U.S.C. § 1563(a)(2), a "brother-sister controlled group" is "one in which five or fewer persons own at least 80% of the voting stock of each corporation," *and* in which "the same persons own more than 50% of the voting stock, taking into account each person's interest only to the degree of identical stock ownership in each corporation." *IUE AFL-CIO Pension Fund*, 788 F.2d at 123. Thus, the controlled group test requires a court to examine two questions: (1) whether the same five or fewer persons own a controlling interest in each of the relevant organizations; and (2) whether, taking into account each person's ownership interest to the extent that such interest is identical with respect to each organization, the same five or fewer persons are in effective control of each organization. *Local 478 Trucking and Allied Indus. Pension Fund v. Jayne*, 778 F. Supp. 1289, 1303 (D.N.J. 1991).

For purposes of question (1), a "controlling interest" is defined as ownership of at least 80% of a corporation's the voting stock. *IUE AFL-CIO Pension Fund*, 788 F.2d at 123; *Local 478*, 778 F. Supp. at 1303. "[E]ach of the five or fewer persons must own some stock." *IUE AFL-CIO Pension Fund*, 788 F.2d at 123 (citing *United States v. Vogel Fertilizer Co.*, 455 U.S. 16 (1982)). For purposes of question (2), "effective control" means that the five or fewer persons must possess "more than fifty percent of the total combined voting power of all classes of stock." *Local 478*, 778 F. Supp. at 1304.

### (3) Notice

The MPPAA requires the trustees of a pension fund to provide the employer with notice of the amount of withdrawal liability and the schedule for payment. *Gotham Fuel Corp.*, 860 F. Supp. at 1047; 29 U.S.C. §§ 1382(2), 1399(b)(1). The MPPAA's notice provisions "require only notice to 'the employer.'" *IUE AFL-CIO Pension Fund*, 788 F.2d at 127. The Third Circuit has held that, because Congress enacted no provision to the contrary, an

acceptable reading of the MPPAA's statutory language "is that because all trade or businesses under common control 'shall be treated . . . as a single employer,' notice to one should be notice to all." *Id.* (alteration in original). Thus, the Court concluded that "[d]eeming the actual notice to the employer corporation serves as constructive notice to all other members of a controlled group is consistent with the language and purpose of both ERISA and the MPPAA." *Id.* (explaining further that the purpose of the MPPAA is "to protect the interests of participants and beneficiaries in financially distressed multiemployer plans" and "to ensure benefit security to plan participants," and noting that ERISA and the MPPAA are subject to liberal construction) (internal quotation marks omitted) (quoting H.R. Rep. No. 869, 9th Cong., 2d Sess. 71, *reprinted in* 1980 U.S. Code Cong. & Ad. News 2918, 2989).

### (i)  Notice in the Context of Successor Liability

In the context of successor liability, the Third Circuit has held that "a purchaser of assets may be liable for a seller's delinquent ERISA fund contributions to vindicate important federal statutory policy where the buyer had notice of the liability prior to the sale and there exists sufficient evidence of continuity of operations between the buyer and the seller." *Einhorn v. M.L. Ruberton Const. Co.*, 632 F.3d 89, 99 (3d Cir. 2011); *see also Resilient Floor Covering Pension Tr. Fund. Bd. of Trs. v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1095 (9th Cir. 2015) (holding "that a bona fide successor can be liable for its predecessor's MPPAA withdrawal liability, both in general and with regard to the special building and construction trade provisions in particular, so long as the successor had notice of the liability.") Nevertheless, "[t]he inquiry should be effectuated on a case by case basis balancing the equities presently before the court." *Einhorn*, 632 F.3d at 99.

The notice requirement in such context "centers on whether the buyer knows about the debts, not whether the buyer knows that the funds intend to seek recovery from it." *Id.* (citing *Upholsters' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1329 (7th Cir. 1990)). "Notice can be

proven not only by pointing to facts that conclusively demonstrate actual knowledge, but also by presenting evidence that allows the fact finder to imply knowledge from the circumstances." *Artistic Furniture*, 920 F.2d at 1329 (citing *Golden State Bottling Co., Inc. v. NRLB*, 414 U.S. 168, 173 (1973); *NLRB South Harlan Coal Inc.*, 844 F.2d 380, 285 (6th Cir. 1988)). For example, one District Court has opined that notice might be inferred where the date of withdrawal from the pension fund preceded the subsequent sale of the company such that the buyer "could negotiate the amount of those debts into the purchase price." *RP Baking LLC v. Bakery Drivers and Salesmen local 194 and Indus. Pension Fund*, 2012 WL 1079649, *4 (D.N.J. Mar. 30, 2012). There, the Court determined that the record was unclear as to when the predecessor employer withdrew from the fund and whether the date of the sale occurred before or after that withdrawal. *Id.* Therefore, the Court found present "a genuine issue of material fact as to notice" which precluded summary judgment for the pension fund. *Id.* at *6.

In determining whether there is "substantial continuity," a court looks to, *inter alia*, the following: "continuity of the workforce, management, equipment and location; completion of work orders begun by the predecessor; and constancy of customers." *See Einhorn*, 632 F.3d at 99 (citing *Fall River Dyeing & Fishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987); *Artistic Furniture*, 920 F.2d at 1329; *see also N. Y. State Teamsters Conference Pension and Ret. Fund v. C & S Wholesale Grocers, Inc.*, 2017 WL 1628896, *7 (N.D.N.Y. May 1, 2017) (finding that the plaintiff pleaded a plausible claim against the defendant based on a theory of successor liability where the plaintiff alleged that defendant and the preceding company "were essentially doing the same job, under the same working conditions, with the same supervisors, the same employees, the same production process, and serving the same customers").

### c. Withdrawal Liability with Respect to Reid Recycling

The Fund contends that defendants waived their right to contest its liability determination by failing to pay the quarterly assessment and failing to pursue arbitration of the issues. (DE 102-2 at 3) Further, Pension Fund argues that defendants have not disputed their controlled group status and that their failure to demand arbitration is a waiver of that right. (DE 102-2 at 4) Finally, the Fund asserts that defendants, as members of a controlled group, "are liable for withdrawal liability even though they were not parties to a collective bargaining agreement" and that their failure to make the required payments "deprives the Court of any discretion to do anything other than order[] that the employer make payment to the fund." (DE 102-2 at 4)

As a threshold matter, Pension Fund is incorrect with respect to defendants' obligation to arbitrate their controlled group status. Whether a corporation was a member of a controlled group at the time a contributing employer withdrew from a pension fund "is a legal question for a district court to decide." *Centra*, 983 F.2d at 501. Indeed, "an entity which has never been an employer within the meaning of the MPPAA is not subject to the arbitrator's jurisdiction" at all. *Galgay*, 105 F.3d at 142. Therefore, whether Reid Recycling was a member of a controlled group with the contributing employer General Contractors is a legal question properly before the Court, and it precedes the question of arbitrability. *See Centra*, 983 F.2d at 501.

Reid Recycling submits that it "is not part of a controlled group with [General] Contractors because it has separate ownership and has remained a separate entity since it was purchased by Reid Holdings in 2012." (DE 105 at 5). Further, the company asserts that Mr. Reid was mistaken when he testified during his deposition that he was the sole owner of Reid Recycling at the time of the sale because the K-1 forms attached to Reid Recycling's 2011 tax return disclose that he was only a 62.3% owner of Reid Recycling in 2012. (DE 105 at 5) DE 105-3 at 1) Defendant also notes that Mr. Reid testified in his deposition

that he was taking medication that negatively affected his memory. (DE 105 at 5; DE 105-2 at 2)

For two interrelated corporations to be deemed a single employer under the MPPAA, the same five or fewer persons must own a controlling interest of at least eighty percent in each corporation and must possess more than fifty percent of the total combined voting stock. *IUE ALF-CIO Pension Fund*, 788 F.2d at 123; *Local 478*, 778 F. Supp. at 1303-04. Here, I find a genuine dispute as to the percentage of Mr. Reid's ownership in Reid Recycling at the time General Contractors withdrew from the pension plan and was served with withdrawal liability notice. Pension Fund notified General Contractors of its withdrawal liability in August 2012. (DE 102-4 at 8-10) Mr. Culnen purchased Reid Recycling on November 30, 2012. (DE 102-1 at 13) Mr. Reid testified that at the time of sale, he owned one hundred percent of Reid Recycling's stock shares. (DE 102-1 at 20) However, defendants submitted a tax return indicating that Mr. Reid owned only 62.3% of Reid Recycling's stock in 2011. (DE 105-3 at 1) The other stocks are represented as being owned by "James H. Reid Spousal Lifetime Access Tr. No 2" (30.5%) and "James H. Reid Spousal Lifetime Access Tr." (7.2%). (DE 105-3 at 2-3) Given the disparity between Mr. Reid's statements and Reid Recycling's tax returns, and bearing in mind that it is the Pension Fund's burden as the moving party to establish no genuine issue of material fact, *see Celotex*, 477 U.S. at 322-23, I find summary judgment is improper. To prove that Reid Recycling was a member of a controlled group, Pension Fund must show that Mr. Reid owned at least eighty percent of the shares of General Contractors and Reid Recycling.[3] Because there is a genuine

---

[3] Of course, Mr. Reid's statement could be attributed to a lapse of memory, or it could signify that, in his mind, he beneficially owned the shares in the name of the trusts, or there may be some other explanation. Such issues cannot be resolved on summary judgment.

12

dispute as to the percentage of Mr. Reid's ownership in the latter company, I will deny the Fund's motion.

A separate ground for denial of summary judgment is the Pension Fund's failure to establish that Reid Recycling is liable as a successor company. For a successor to be liable for its predecessor's withdrawal liability, the successor must have had notice of the preexisting debt and there must exist "sufficient evidence of continuity of operations between the buyer and the seller." *Einhorn*, 632 F.3d at 99. As for notice, it may be possible to infer that Reid Recycling was aware of the withdrawal liability because General Contractors withdrew from the Fund and the Fund demanded payment months before Mr. Reid sold Reid Recycling to Mr. Culnen. *See RP Baking LLC*, 2012 WL 1079649 at *4. However, there is nothing in the record or in Pension Fund's briefing to this Court that establishes continuity of operations. Pension Fund has not demonstrated whether there was continuity in the workforce prior to and after Reid Holdings acquired Reid Recycling, whether the management, equipment, or location remained the same, whether Reid Recycling continued to complete work orders begun when Mr. Reid still owned the company, or any constancy in customers. *See Einhorn*, 632 F.3d at 99. For those reasons, in addition to the Fund's failure to establish the company's membership in a controlled group, Pension Fund's summary judgment motion fails as against Reid Recycling.

### d. Withdrawal Liability with Respect to Reid Construction

Thus far I have focused on Reid Recycling, but defendants also oppose the Fund's summary judgment motion as to Reid Construction. (DE 105 at 2) There is nothing in the record that speaks to the composition of Reid Construction's ownership at the time General Contractors withdrew from Pension Fund and became liable for payments.[4] Indeed, not even defendants'

---

[4] The excerpt of Mr. Reid's deposition provided by the Fund contains only the following exchange concerning Reid Construction:

briefing mentions Reid Construction's ownership. (*See* DE 105) Given that information vacuum regarding Reid Construction's ownership at the time General Contractors withdrew from the Fund (or indeed at any time thereafter), I will deny Pension Fund's summary judgment motion with respect to Reid Construction as well.

---

Q: Mr. Reid, have you had a chance to look at Exhibit P-6?

A: Yes.

Q: Okay. Do you recognize it?

A: No.

Q: Okay. I'm going to represent to you that this document was downloaded from the New Jersey Business Gateway Service, and in looking at it, at the very top, it says "CERTIFICATE OF INCORPORATION OF J.H. REID CONSTRUCTION, INC." Does that help refresh your recollection from earlier as to whether or not there was such a company?

A: No.

Q: Okay. Do you have any reason to doubt the authenticity of this document?

A: I don't recognize it.

Q: Okay. No problem. Notwithstanding the fact that you don't recognize the document, do you doubt that its actually an accurate copy of a document from the files of the State of New Jersey corporation records?

A: No.

Q: Okay. Is there anyone else who would have had the authority to create a corporation with your name on it?

A: No.

(DE 102-1 at 19)

The reference is to a Certificate of Incorporation, filed in 1989, which lists Mr. Reid as the initial member of the Board of Directors. (DE 102-1 at 27-28)

12

### III.    Conclusion

For the reasons set forth above, I will grant summary judgment as to the withdrawal liability of General Contractors, which is not contested, but deny summary judgment to the extent Pension Fund's motion seeks to hold Reid Recycling and Reid Construction liable for withdrawal liability payments.

An appropriate order follows.

Dated: October 16, 2020

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**